**INLAND STEEL COMPANY**

v.

**The UNITED STATES.**

No. 481–76.

United States Court of Claims.

April 7, 1982.

Frederic W. Hickman, Chicago, Ill., attorney of record, for plaintiff; Lawrence M. Dubin, Michael F. Duhl, Michael M. Conway and Hopkins & Sutter, Chicago, Ill., of counsel.

Robert S. Watkins and Marc Levey, with whom was Acting Asst. Atty. Gen., John F. Murray, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

William P. McClure, Washington, D. C., attorney of record for amicus curiae Motion Picture Ass'n of America, Inc.; John D. Heckert, Robert Feldgarden, Howard J. Silverstone and McClure & Trotter, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and SMITH, Judges.

## OPINION

PER CURIAM: *

Inland Steel Company, an integrated steel manufacturer, claimed refunds for taxes paid for calendar years 1964 and 1965 on four issues, two of which have been

---

* This opinion has its basis in that of Trial Judge Harkins, with several modifications, deletions, additions, and rearrangements. We reach the same results.

The court adopts the trial judge's findings of fact, with the changes indicated in the order entered this day, but the findings are not reproduced with this opinion. Any findings contained in this opinion that are not also embodied in the formal findings shall likewise be considered part of the court's findings.

compromised and dismissed.[1] Two issues, the deductibility of certain accruals in Inland's Supplemental Unemployment Benefit plan (SUB) and credit for taxes paid pursuant to the Ontario Mining Tax Act (OMT), have been tried and are disposed of in this opinion, in Parts I and II respectively.

I

*Supplemental Unemployment Benefit Plan—Revised Savings and Vacation Plan.*

This court has twice considered whether certain accruals under Inland's Supplemental Unemployment Benefit (SUB) plan may be deducted under I.R.C. § 162.[2] Challenged accruals during calendar years 1962 and 1963 were found properly deductible in their entirety; accruals for calendar years 1964 and 1965 were found to be deductible insofar as they were not available for use in paying out benefits under a related savings and vacation plan, and the case was remanded (by order of May 19, 1978), for further proceedings as to accruals available for use in paying out such benefits.[3] This opinion deals with that issue.

A. *Background.* A program to supplement benefits available to laid off steel workers from state unemployment benefit programs was first negotiated between the United Steelworkers of America (Steelworkers Union) and representatives of the major steel companies in 1956. The industrywide master settlement agreement was followed routinely by agreements with the individual companies, and nearly all companies in the basic steel industry established and put in operation virtually identical Supplemental Unemployment Benefit (SUB) plans. The 1956 SUB plan was financed by

company contributions of 5 cents per hour worked by covered employees, of which 3 cents were cash payments to the trust and 2 cents were accruals to an account designated Contingent Liability (CL). The CL account was available to pay benefits if trust assets were insufficient, and, if in any month the trust funds and the CL exceeded maximum financing, as defined, the CL was canceled to the amount of the excess. The CL could be canceled in full on termination of the SUB plan.

In 1962, the SUB plan was revised to provide increased benefits, a larger contribution per hour worked, and accruals to CL were made noncancelable. As revised, the 1962 SUB plan required a contribution of 9.5 cents, of which 4.5 cents were cash payments to the trust, and 5 cents accrued to an account, which (although the accruals could not be canceled for any reason whatsoever) continued to be referred to as the Contingent Liability account. The definition of maximum financing was changed to permit expanded benefits, but the obligation to accrue 4.5 cents per hour worked per covered employee continued after maximum financing was reached. Accruals in excess of the requirements of maximum financing were a part of the CL account and were noncancelable except to pay benefits under the SUB plan; for convenience these accruals in excess of maximum financing were separately reported in Inland's accounts and were commonly referred to as Additional Contingent Liability (ACL).

In the 1962 negotiations, the Steelworkers Union contended the provisions of the 1956 SUB that permitted cancellation of CL deprived the plan of resources needed to

---

1. The issue concerning plaintiff's relationship with the jointly owned Wabush Pellet Co. was dismissed with prejudice on May 2, 1978; the placed-in-service issue relative to certain construction projects at the Indiana Harbor Works, East Chicago, Indiana, was dismissed with prejudice on Dec. 12, 1979.

2. Internal Revenue Code of 1954, as amended; Income taxes codified in 26 U.S.C. §§ 1–1564 (1976).

3. Both rulings were on motions for summary judgment. Qualification of accruals for 1962 and 1963 was ordered on Nov. 26, 1976, and reported in *Inland Steel Co. v. United States*, 212 Ct.Cl. 558, 76–2 U.S.T.C. ¶ 9791 (1976) (Inland Steel I); on May 19, 1978, in this case, the court granted summary judgment in part and remanded for trial certain accruals for 1964 and 1965 (*Inland Steel Co. v. United States*, 217 Ct.Cl. 647, 78–1 U.S.T.C. ¶ 9467 (1978) (Inland Steel II).

pay SUB benefits. The union also complained that the steel companies took credit for a 5 cents per hour contribution that in fact was less because of the CL cancellation provisions. Insistence by the President of the United States on a 10 cent limit on collective bargaining benefits reduced the negotiators' flexibility, and led to the union's insistence that the 10 cent limit had to be a "hard dime." This objective was accomplished by the agreement to eliminate the cancellation feature of the prior plan and to make all the amounts the company was required to accrue to CL in excess of maximum financing noncancelable.

Since 1962, the Internal Revenue Service has challenged unsuccessfully, on different theories, the deductibility of accruals to the Contingent Liability accounts of the 1962 SUB plans. This court, in *Inland I*, held that accruals to CL in 1962 and 1963 met the "all events" test of I.R.C. § 461; *Inland II* so holds for 1964 and 1965. *Lukens Steel* holds that the CL accruals were deductible when accrued in 1962 and 1963 because they were irrevocably committed to pay for benefits even though the time of payment was indefinite, so also with *Reynolds Metals* for 1962 and 1963; *Cyclops* for 1962 through 1966; and *Timken* for 1962 and 1963.[4] Now we are concerned with the separate issue,

raised by the Government, whether I.R.C. § 404 (relating to deferred compensation) bars deductions under § 162 for accruals that could be transferred for pay-outs under a new (in 1962–3) savings and vacation plan.

The 1962 negotiations included institution of a plan to provide additional savings and vacation benefits. The 1962 Savings and Vacation Plan (SVP) was financed by an accrual of 3 cents per hour worked by employees covered by the plan into a Financial Availability Account (FAA). The negotiators recognized the 1962 SVP was inadequate to have a substantial effect on the unemployment rate, and viewed it as an interim device, to be renegotiated in 1963.

The 1962 SVP, in addition to the 3 cent accrual, provided that up to 4.5 cents per hour worked by covered employees (which were the same employees covered by the SUB plan) could be transferred from ACL to the FAA to the extent required to provide SVP benefits.[5] The SVP benefits were (1) retirement units—one week's pay for each 5 years of service prior to January 1, 1961, to be paid at time of retirement, and, (2) vacation units—one week's pay for each employee for every 2 years of continuous service. Vacation units could, by option, be taken as vacation or by a cash

---

**4.** *Inland I & II, supra* note 3; *Lukens Steel Co. v. Commissioner*, 52 T.C. 764 (1969), aff'd, 442 F.2d 1131 (3d Cir. 1971); *Cyclops Corp. v. United States*, 408 F.Supp. 1287 (W.D.Pa.1976); *Reynolds Metals Co. v. Commissioner*, 68 T.C. 943 (1977); *Timken Co. v. United States*, 218 Ct.Cl. 633, 78–2 U.S.T.C. ¶ 9653 (1978).

**5.** Article XVII (Savings and Vacation Plan) Section 2 (Financing) of the April 6, 1962, Agreement between Inland and the Steelworkers Union (before the June 29, 1963, amendment) included in part the following provisions:

"There shall be an added accrual to the Financial Availability Account of amounts made available in the following manner:

"(1) For the month of July, 1962, and each month thereafter, if under the SUB Plan the amount required to raise total finances to maximum financing is less than the Company's maximum monthly obligation under that Plan, there shall be available for accrual an amount calculated by multiplying the total hours worked by employees covered by this Savings and Vacation Plan in such month by the lesser of (a) 4.5 cents and (b) the difference between

9.5 cents and the amount per contributory hour required to raise total finances of the SUB Plan to maximum financing.

"(2) The accrued amount determined in (1) above shall in no event be in excess of the amount required to provide (a) benefits to individuals then entitled because of retirement to benefits based on their retirement units and vacation units and (b) vacation benefits to employees having at least one full vacation unit as of the current or next preceding Calculation Date.

"(3) Any amounts which would have been accrued to the Financial Availability Account pursuant to (1) above except for the provision of (2) above, and which were therefore added to the total finances of the SUB Plan, and which have not been used for payment of benefits under that Plan, shall be accrued to the Financial Availability Account and deducted from the total finances of the SUB Plan to the extent then needed for the provision of retirement and vacation benefits."

payment into the trust to be paid on retirement. The 1962 SVP did not provide for transfer back to ACL of amounts that became available to the FAA and used for SVP benefits. This relationship between the ACL and the FAA was not found by the court in *Inland I* to bar deductibility of CL accounts, pursuant to I.R.C. § 162, under the SUB plan for calendar years 1962 and 1963. Inland's 1962 SVP was almost identical with the savings and vacation plan provisions reported and approved in *Lukens Steel.*[6]

Inland's agreement with the Steelworkers Union was amended June 29, 1963, to provide a Revised Savings and Vacation Plan (RSVP) which was effective for a 5-year term from January 1, 1964, through December 31, 1968. In the 1963 negotiations, the union and the steel industry agreed that all Contingent Liability in excess of maximum financing (ACL) that arose prior to 1964 would not be available for transfer to the FAA. October 31, 1963, was the last entitlement date on which pre-1964 CL potentially could be transferred to the FAA under the 1962 SVP. After December 31, 1963, the entire balance of CL, including any amounts in excess of maximum financing, was irrevocably committed to the payment of benefits under the SUB plan.

The restructured RSVP that became effective on January 1, 1964, was financed from accruals to the FAA, which were increased (from the SVP's 3 cents) to 12.5 cents per hour worked by covered employees after December 31, 1963. The 12.5 cents per hour accrual was established jointly by the negotiators as adequate to assure payment over the 5-year term of the significantly expanded list of basic benefits the companies were obligated to provide. In order to accelerate provision of basic benefits to the senior group, which otherwise would be spaced over 5 years, and increase job openings by earlier and additional vacations, the RSVP authorized transfers of ACL from the SUB plan to the FAA. ACL so transferred, referred to as "spillover", amounted to 3.125 cents per hour worked after December 31, 1963; in exceptional circumstances (which did not occur) up to 4.5 cents could spillover. The RSVP also provided that all spillover amounts would be returned to ACL after all basic benefits had been financed and the 12.5 cents accrual to the FAA exceeded current RSVP requirements. The amounts returned, referred to as "splashback," ranged from 6.5 cents to 3.5 cents per hour worked and continued until all spillover was exactly offset by splashback.

Basic benefits guaranteed in the RSVP included both vacation benefits that could be taken currently and financial benefits that could be put in a trust and deferred until retirement.

In fiscal year 1964, Inland accrued $1,331,270 in the CL account, of which $1,321,719 was in excess of SUB maximum financing (ACL). In fiscal year 1965, Inland accrued $1,346,527 in the CL account, of which $1,338,440 was in excess of SUB maximum financing (ACL).

Accruals to the CL account that were required to attain maximum financing were not available for paying out benefits under the RSVP and plaintiff was granted sum-

---

**6.** Transfers from SUB contingent liability to the financial availability account of Lukens Steel savings and vacation plan were described as follows:

"In addition the 1962 SUB plan provided that contingent liability, to the extent that it was not needed to achieve maximum financing of the SUB plan and in an amount not to exceed 4.5 cents per hour worked by employees covered by the savings and vacation plan, shall be added to financial availability account of the savings and vacation plan in an amount which would cover employee benefits accumulated under that plan. Amounts of Contingent Lia-

bility not utilized by the savings and vacation plan in the manner stated above were to be returned to the SUB plan to be made available for SUB plan benefits and also for future savings and vacation plan benefits to the extent assets or credit available to the savings and vacation plan financial availability account were insufficient to finance accumulated employee benefits. The contingent liability amounts so returning to the SUB plan were to be ignored in calculating petitioner's periodic obligation to make payments or credits to the SUB plan." *Lukens Steel*, 52 T.C. at 783 n.6.

mary judgment in *Inland II* that such amounts qualified for deduction under I.R.C. § 162. Amounts of ACL that spilled over to the FAA between January 1, 1964, and April 30, 1965, were immediately paid out either to the employee or into the trust for deferred benefits. Inland has claimed and received tax deductions for all such spillover amounts on a payment basis and no such amounts are involved in this case. Accruals to ACL for which Inland now claims entitlement to a deduction (for 1964 or 1965) are amounts which were not used to pay any benefits under the RSVP.

■ B. *Discussion.* The Government invokes the provisions in I.R.C. § 404 which generally foreclose a taxpayer's payments of deferred compensation from immediate deduction under § 162, and permit them to be taken into account only when actually made to or for the benefit of the recipient. *See Raybestos Manhattan, Inc. v. United States,* 220 Ct.Cl. 224, 597 F.2d 1379 (1979). On that premise, defendant urges: (1) the entire spillover portion of ACL is an integral part of RSVP; (2) the whole of RSVP, including the spillover from ACL, is and was represented by taxpayer as a plan for deferred compensation (under § 401) to which § 404 is applicable; and accordingly (3) the spillover sums now at issue cannot be deductible in the taxable years. There is much controversy over the components of the first two basic premises, and those questions are not as clear as each side would have it.[7] The trial judge confronted these problems and decided them against the defendant. For this case, however, we can skirt them—assuming *arguendo,* without deciding, that the Government's positions are correct on those two underlying questions. Nevertheless, we must depart from the end-result suggested by defendant because of twin critical facts: first, that, due to the working and intention of the splashback mechanism (which was an integral part of both SUB and RSVP plans) in the taxable years (1964 and 1965) none of the spillover funds now involved were used (or expected to be used) to provide RSVP benefits—it was in effect as if none of those ACL funds spilled over to RSVP—and, second, the great improbability that those spillover funds would be needed or utilized for RSVP benefits.

The stark facts are that by December 31, 1965, Inland had accrued sufficient amounts in the FAA (available for RSVP) to provide splashback of all amounts previously spilled over from the Additional Contingent Liability account (ACL) in 1964 and 1965; and by February 1, 1966, Inland's splashback account had returned to the SUB ACL all amounts that had been spilled over to finance RSVP benefits. All of the other 10 major steel companies that constituted the Coordinated Committee Companies in the collective bargaining negotiations returned on or before April 30, 1967, pursuant to the splashback provisions, all amounts that had spilled over to RSVP financial accounts.

The result was that in this case spillover was never needed for the RSVP benefits, and if initially used as an advance was shortly paid back via splashback to ACL.[8] Because the spillover funds (now at issue) were never effectively used at all to pay deferred compensation (accepting, *arguendo,* the defendant's postulates that all RSVP benefits amounted to deferred compensation), these accruals do not fall under § 404, but, rather, under § 162. They were in fact all committed—until the end of the RSVP plan—to SUB benefits, which are not claimed to involve deferred compensation and, as we have held, payments for which are deductible under § 162.

---

7. Controverted issues include: (1) the exact relationship of ACL to the SUB and RSVP plans; (2) the relationship of SUB and RSVP to each other; (3) whether RSVP benefits were all deferred compensation, or only in incidental part; (4) whether plaintiff represented to the IRS, or the IRS ruled, that all RSVP payments would represent deferred compensation or come under a profit-sharing plan.

8. It would be irrelevant to the purposes of the spillover-splashback mechanism, as well as the objectives of the special provisions for taxation of deferred compensation, to apply here, formalistically, the rule of "first in, first out" which is generally used where it is necessary to differentiate among different payments.

Defendant traces its conclusion that accruals to the SUB ACL account are nevertheless not deductible under I.R.C. § 162 to limitations in Treasury Regulations (on the income tax) that are designed to reach potential contingencies, especially the provision in Treas. Reg. § 1.162–10(a) (1960) that precludes deduction under I.R.C. § 162(a) if "under any circumstances" the monies may be used to provide benefits under deferred compensation plans of the type referred to in I.R.C. § 404(a).[9] We read this phrase, "under any circumstances,"[10] as meaning any reasonable or realistically possible and practical circumstance—not merely theoretical or conceivable possibilities which are not serious, expectable, within contemplation, or actual. Content is given to this phrase (and similar ones) by Reg. § 1.404(a)–1 (1963) which speaks of employer plans providing so-called "combined" substantial benefits—some involving deferred compensation, and some not; in that situation the addition of a tangible non-deferred benefit may not remove the contribution from deferred treatment. That type of solid potentiality is a far cry from hypothetical but very unlikely possibilities. *Cf. William C. Turner*, T.C. Memo 1981–598 (in a different context, refusing to accept a "theoretical" or "conceivable" possibility).

In this instance, there was no such reasonable possibility of these spillovers being used for RSVP benefits during the term of the RSVP plan. Our findings (fdgs. 38(a), 39(c)) show that the RSVP was deliberately intended by the parties to assure that all spillover from ACL be returned through splashback for the period spillover was in effect.[11] Only in the event of severe economic dislocations beyond the "worst case" experience utilized by the negotiating committees in their unemployment projections, would it have been possible for a situation to develop where there was spillover at one stage but never any splashback. Such an event would have been extraordinary and would not have been in the range of the negotiators' predictions. Thus, it would require an extraordinary combination of circumstances, such as an unprecedentedly long wildcat strike or a "great depression", to result in an inability of the RSVP to operate as projected and splashback all spillover. The risk of this happening was too minimal, too uncontemplated, too remotely hypothetical, to fall within the meaning or purpose of the phrase, "under any circumstances" (and the comparable regulations).[12]

We hold, on this ground, that the spillover sums involved here were not used or reasonably subject to be used for RSVP

---

**9.** Defendant emphasizes that Treas.Reg. § 1.404(a)–1(a)(1) (1963) makes § 404(a) applicable to "any plan" of deferred compensation, that Treas.Reg. § 1.404(a)–1(a)(2) (1963) notes that § 404(a) allows deductions under certain plans that are "solely" for a particular purpose, and that Treas.Reg. § 1.404(a)–1(a)(3) (1963) specifies that if contributions to a deferred compensation plan "can be used" to provide "any" such benefits, § 404(a) applies to the "entire contribution" to the plan.

**10.** As well as the other regulatory references in note 9, *supra*.

**11.** The funding mechanism of RSVP (without spillover) was designed to pay for all the benefits payable under that plan, with a 25% cushion. Conversely, the ACL (including the amounts which could spillover) was primarily to be devoted to the SUB benefits.

**12.** As was said by Judge Laramore in *Hudspeth v. United States*, 471 F.2d 275, 277 (8th Cir. 1972), for a different problem, "the realities and substance of the events must govern our determination, rather than formalities and remote hypothetical possibilities."

As our findings show, spillover was eliminated by the end of 1968. After that time, amounts of ACL would not be loaned, used or spent for RSVP benefits. There was no reasonable possibility, at the beginning of the RSVP plan, of these monies thereafter being used for RSVP benefits. The fact that subsequently, in the *1968* negotiations, the parties newly agreed that the funds remaining in the ACL should then be paid as vacation bonus in 1969 (after the term of the 1962 plan) does not show that any such deferred-compensation use was reasonably foreseeable or likely when the RSVP was earlier adopted. At that earlier time, all that was likely is that the unused ACL would not be returned to taxpayer, but it was wholly unknown what kinds of benefits the money would be used for.

benefits, and are therefore deductible under § 162.

## II

### Ontario Mining Tax

Plaintiff conducted an iron ore mining operation in Atikokan, Ontario, in 1964 and 1965 through a wholly-owned subsidiary, Caland Ore Company, Limited (Caland). Development of the open pit iron ore mine began in approximately 1952 or 1953 on property leased from Steep Rock Iron Ore Mine Company, a privately-owned company; commercial production started in 1960 or 1961. From the start of operations, and during 1964, Caland sold unprocessed ore that was shipped directly from the mine site as soon as it was mined. Caland did not maintain an inventory of unsold ore at year-end. In 1965, Caland sold both iron ore and pellets produced in a processing operation that commenced that year. In 1965, at year-end Caland had an unsold inventory of unprocessed ore at the mine site.

Caland paid taxes on its mining operation under the Ontario Mining Tax Act [13] (OMT) which were claimed as an I.R.C. § 901 foreign tax credit on plaintiff's consolidated United States federal income tax return. In the relevant years, the Internal Revenue Service required the OMT payments to be reported as deductions under I.R.C. § 164. Caland's 1964 OMT payment of $947,537 was based solely on sales of unprocessed iron ore. Caland's 1965 OMT payment, as finally approved by the Ontario mine assessor, was based solely on the proceeds of sales of unprocessed iron ore and processed pellets, and the 1965 OMT return did not include a valuation for Caland's inventory of unsold ore. Caland's 1965 OMT tax payment was $365,412; Caland claims a total of $1,006,906 as available for carryover and carryback to 1965. The sum of all OMT amounts in issue is $2,589,855.

In addition to its OMT tax payments, in 1964 and 1965, Caland was subject to and paid income taxes to Canada, under the Income Tax Act of Canada, and to Ontario under the Ontario Corporation Tax Act. Plaintiff has obtained I.R.C. § 901 foreign tax credit for the amounts paid pursuant to those income tax laws.[14]

The tax credit in I.R.C. § 901 [15] is a device designed to eliminate double taxation on income generated in a "foreign country," which the Treasury Regulations define to include any foreign state or political subdivision.[16] Whether a foreign tax is an income tax under I.R.C. § 901(b)(1) is to be decided under criteria established by United States revenue laws and court decisions. To be creditable, the foreign tax must be the substantial equivalent of an income tax as that term is understood in the United States.[17]

I.R.C. § 901(b)(1) provides an exemption from taxation to the extent of the tax paid to the foreign country. It is a privilege extended by legislative grace, and the exemption must be strictly construed.[18] The purpose of the foreign tax credit is to encourage domestic corporations to do business abroad without having to operate through a foreign corporation.[19] The primary objective of the foreign tax credit,

---

**13.** Ont.Rev.Stat. c. 242 (1960).

**14.** Plaintiff's petition also sought credit under I.R.C. § 903 for the OMT payments. This issue has not been pursued and is considered to be abandoned.

**15.** 26 U.S.C. § 901(b)(1) (1976) provides a credit to United States income taxpayers for the "amount of any income, war profits and excess profits taxes paid or accrued during the taxable year to any foreign country. . . ."

**16.** Treas.Reg. § 1.901–2(b) (1960).

**17.** *Biddle v. Commissioner*, 302 U.S. 573, 58 S.Ct. 379, 82 L.Ed. 431 (1938); *Missouri Pacific R.R. v. United States*, 183 Ct.Cl. 168, 175, 392 F.2d 592, 597 (1968); *Allstate Ins. Co. v. United States*, 190 Ct.Cl. 19, 27, 419 F.2d 409, 413–14 (1969).

**18.** *Keasbey & Mattison Co. v. Rothensies*, 133 F.2d 894, 898 (3d Cir.), *cert. denied*, 320 U.S. 739, 64 S.Ct. 39, 88 L.Ed. 438 (1943).

**19.** *New York & Honduras Rosario Mining Co. v. Commissioner*, 168 F.2d 745, 749 (2d Cir. 1948).

however, is to prevent double taxation; encouragement of American foreign trade is a secondary objective.[20]

■ A. *The test.* In *Bank of America,*[21] this court has distilled the authorities and articulated the applicable test. To qualify as an income tax in the United States sense, the foreign country must have made an attempt always to reach some net gain in the normal circumstances in which the tax applies. Taxes plainly on subjects other than income, even though measured to some extent by income, are not income taxes. The label and form of the foreign tax is not determinative. In *Bank of America,* where the court had before it taxes on gross income from the banking business, the test was stated as follows: [22]

This review of the pertinent judicial decisions and Internal Revenue Service rulings, as well as of comparable gross income levies in the federal income tax system, persuades us that the term "income tax" in § 901(b)(1) covers all foreign income taxes designed to fall on some net gain or profit, and includes a gross income tax if, but only if, that impost is almost sure, or very likely, to reach some net gain because costs or expenses will not be so high as to offset the net profit.

In that case, the special banking levies did not qualify for the credit because no provision was made to account for the costs or expenses of producing the income. The tax would fall on banks that were successful as well as those that were unsuccessful. Failure to take into account operating expenses normal to an active business indicated the governments involved had not designed the taxes to "nip" net profit.

The court's analysis in *Bank of America* shows that it is important, for the foreign tax credit, to determine the expenses of which the foreign tax takes account, in order to see whether taxation of net gain is the ultimate objective or effect of that tax. For instance, a gross income tax on mining royalties was creditable when the taxpayer did not operate the mine and retained only a royalty right under its contract with the operator. In such a situation, no costs or expenses of the taxpayer to obtain the royalties would over balance them and the taxpayer would not suffer a deficit on the royalty transaction even if the mining operations went badly. Similarly, a Mexican tax on receipts in the form of interest or rents was creditable because such interest and rents, taxed at the source, are rarely, if ever, wholly offset by the taxpayer's costs or expenses of obtaining that type of income; a Brazilian tax on gross earnings from interest and dividends was creditable because that type of passive investment income involved few or no expenses of production.[23]

On the other hand, when the income came from an active asbestos quarry, a tax that restricted allowable deductions to costs incurred in mining operations only, with no deductions for expenses incident to the general conduct of the business, was not creditable.[24] Similarly, in *Bank of America,* the foreign taxes were not creditable because no provision was made to reach the net gain realized after an accounting for costs normally incident to the banking business.

Problems of that type are what we have to consider here. Caland's income subject to the OMT is generated in the conduct of an iron ore mining business. Creditability of the OMT under I.R.C. § 901 requires a

20. *Commissioner v. American Metal Co.,* 221 F.2d 134, 137 (2d Cir.), *cert. denied,* 350 U.S. 829, 76 S.Ct. 61, 100 L.Ed. 740 (1955).

21. *Bank of America Nat'l Trust & Sav. Ass'n v. United States,* 198 Ct.Cl. 263, 459 F.2d 513, *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972).

22. *Id.* at 281, 459 F.2d at 523.

23. *Bank of America Nat'l Trust & Sav. Ass'n v. United States, supra,* 198 Ct.Cl. at 276, 459 F.2d at 520, analyzing *Santa Eulalia Mining Co. v. Commissioner,* 2 T.C. 241 (1943); and 198 Ct.Cl. at 279, 459 F.2d at 522, analyzing I.T. 2620, 11–1 Cum.Bull. 44 (1932) and I.T. 4013, 1950–1 Cum.Bull. 65.

24. *Keasbey & Mattison Co. v. Rothensies, supra,* 133 F.2d at 897–98.

determination that the deductions normally or essentially incident to the general conduct of that business are available in computation of the OMT liability so as to assure that the tax applies only to the net gain produced by the business.

B. *Operation of OMT.* Unlike the Canadian federal and provincial income taxes, which are administered by their respective revenue departments, the OMT is administered by ministries concerned with mining and natural resource regulation.[25] Structurally, the OMT in the relevant years was organized to provide a graduated rate of tax on net profits above $10,000, as determined by the statutory formula, from the taxpayer's mineral extraction activity.

The OMT profit is determined by deducting specified mining expenses from the gross revenue from production. The mine assessor considered the mining operation to end, under the OMT, when the ore passed through the primary crusher, even if the crusher were located underground.

The OMT provides three methods to compute gross revenue from mine production: (1) when unprocessed ore is shipped from the mine site, the gross revenue is the amount received from sales; (2) if the ore is processed at the mine, the gross revenue is "the amount of the actual market value of the output at the pit's mouth"; (3) if the ore is processed at the mine, and there is no means of ascertaining such actual market value, the gross revenue is the "amount at which the mine assessor appraises such output."

The computation authorized in method No. 2 was an administrative shortcut that in practice was utilized by the mine assessor only for the mining of gypsum and gold. This method allowed inventory produced and processed, but unsold at year-end, to be valued and the OMT profit therefrom to be taxed, even though the income was not yet "realized" under United States standards.

Caland's gross revenue reported on its 1964 OMT return was computed as authorized by method No. 1; its gross revenue for 1965, when it produced both unprocessed and processed ore, was calculated as permitted in method No. 3. Caland's original 1965 OMT return included a valuation for unsold ore in inventory. On review, the mine assessor required the return to be amended to eliminate that value. The administrative procedure to appraise the value of output at pit's mouth in method No. 3 followed by the mine assessor's office included in gross revenue only the proceeds of ore and pellets actually sold during the year. No valuation was placed on ore in inventory but unsold at year-end.

The mine assessor generally followed a standard procedure in a method No. 3 appraisal of the value of output at the pit's mouth. This procedure involved deduction from the sale price of the processed product of: (1) costs of processing and marketing; (2) a portion of head office expenses allocable to processing; (3) an allowance for depreciation of processing plant; and (4) an allowance for a processing profit. The processing profit allowance was an arbitrary 8 percent of original cost of processing assets, but not less than 15 percent or more than 65 percent of the profits of the combined mining and processing operations before deduction of the allowance itself.[26]

The OMT lists ten categories of expenses and allowances that may be deducted from the proceeds attributable to the extraction activity. These deductions include transportation costs, working expenses (including office overhead) directly connected with the mining operation, depreciation of mining plant, and certain exploration and development costs incurred anywhere in Ontario following commencement of production.

---

25. The Canadian income tax is administered by the Canadian Department of National Revenue; the Ontario income tax is administered by the Ontario Ministry of Revenue; the OMT in 1964 and 1965 was administered by the Ontario Department of Mines and, at the time of trial by the Ministry for Natural Resources, Mineral Resources Branch.

26. Caland's 1965 processing allowance on its amended return was 15 percent of the combined profits allowed for its mining and processing operations.

Not all expenses directly identified with the general conduct of the mining activity were allowable deductions. The mine assessor excluded 15 categories of business and administrative expenses that were not considered to be directly related to the extraction of ore. These included: costs of acquiring land (including legal fees, purchase price, option payments, rent, miner's license fee, recording fees and royalties other than to the Crown), taxes of all kinds, municipal, provincial and federal (except sales and excise taxes on purchases of goods and equipment), cost of annual meetings, and 50 percent of director's fees and expenses.

In addition to mine operating expenses excluded by the mine assessor, the OMT specifically did not permit to be used in the computation of OMT profit: a deduction for interest or dividends on capital, royalty payments to private parties, depletion of mineral resources, and certain preproduction exploration and development expenses. Caland incurred preproduction exploration and development expenses, at its Atikokan mine from the inception of development, of approximately $30.8 million (Can.), of which $7.3 million (Can.) were eligible for deduction. Caland's royalty payment to Steep Rock Iron Ore Company of $3,448,376 (Can.) in 1964 and $4,172,673 (Can.) in 1965, were not included in the computation of OMT profits for those years. Caland's interest expenses of $1,842,293 (Can.) in 1964 and $1,831,836 (Can.) in 1965 for financing the mining venture were not included in the computation of OMT profit for those years. Caland's 1964 and 1965 computation of OMT profits did not include an allowance for the physical depletion of its mineral resource.

C. *History and Purpose of OMT.* The OMT is a formulary tax that nominally and structurally is designed to reach a particular type of net profit derived from a statutorily circumscribed business activity—the extractive phase of a mining operation. The tax is a hybrid type of tax, with both income tax and property tax features. It is structured and administered to allow a formulary profit that is designed to overcome Canadian constitutional limitations and to simplify administration of collection burdens. The historical development of the OMT, and its present position in the Canadian tax structure, support the conclusion that the OMT is a tax on the privilege of mining in Ontario. Notwithstanding its nominal objective to reach a defined net profit, the OMT was not intended to reach a concept of net gain in the United States tax sense, even when restricted to the limited business activity to which it applies.

In the Canadian system, the federal government is authorized to raise money by any mode or system of tax, and may levy both direct and indirect taxes. Provincial governments derive their taxing powers from the 1867 British North American Act, and are empowered to levy only direct taxes within the province in order to raise revenue for provincial purposes.[27]

In a purely economic analysis, the distinction between a direct and an indirect tax is blurred. Every traditionally indirect tax would have some persons who are the first and final payers, and, conversely, every direct tax may on occasion be shifted to another. The Canadian courts, however, in order to have a concept of general application, have abandoned a strict economic analysis and have applied a simplified expression of the classical definition. The judicial test is that a direct tax is intended to be borne by the person on whom imposed and the payer of an indirect tax is supposed to indemnify himself at the expense of another.[28]

27. The British North American Act, 1867, section 92, provides:

"In each Province the Legislature may exclusively make Laws in relation to Matters coming within the Classes of Subject next herein-after enumerated; that is to say,—

.    .    .    .    .

"2. Direct Taxation within the Province in order to the raising of a Revenue for Provincial Purposes."

28. *Nickel Rim Mines, Ltd. v. Attorney General for Ontario*, 53 D.L.R.2d 290, 294 (1965), citing and quoting *Bank of Toronto v. Lambe*, 12 App.Cas. 575 (1887). The definition, by John Stuart Mill, quoted with approval was:

.

Before confederation, the Province of Ontario imposed a royalty, an indirect tax, on the value of ores raised or mined. In 1907, Ontario introduced a tax on profits derived from the extraction of ore, which with minor amendments was embodied in the Mining Tax Act of 1914. The revision was made so that the OMT would be a direct tax that would be constitutional under Canadian law. Constitutional validity of the OMT has been considered, and the Ontario Court of Appeals has held the OMT to be a "direct tax" in the Canadian sense. In its opinion, the court stated that the OMT is not a tax on gross profit but a tax on "what might very reasonably, I think, be described as net profit." [29] This characterization is not unimportant, but at the same time it is not decisive, nor is it necessarily to be taken as referring to "net profit" in the sense known to the United States.

The "net profit" that is reached by the OMT is based exclusively on the mining activity and is an artificial concept utilized to satisfy the requirements of Canada's tax system. An official report by the Ontario Committee on Taxation in 1967 (the Smith report), noted the hybrid nature of the OMT and the omission of various elements that normally enter a calculation of profit. According to the Smith report, "[o]ne fundamental criticism" of the OMT is that its nature is not clear. "It is neither a tax on actual profits, because of the severe limitation on deductions, nor a royalty. The

present position seems to have been reached by a process of arbitrary decision-making rather than as a logical result of basic principles." [30]

The Smith report notes that Ontario had adopted a profits tax to assure classification as a "direct tax" on the operator, because a province is constitutionally unable to impose a royalty on mineral production on private land. The OMT was distinguished from a royalty reserved to the Crown. The report concluded: "In order to impose a constitutionally valid royalty on mineral production, the whole basis of land tenure for mining companies in Ontario would have to be changed." The Smith report accepted the concept of a profits tax because it is "probably better suited than a royalty to obtain a revenue from a high-risk industry, inasmuch as, unlike a royalty, it does not tend to convert a marginally successful mine into a loser." [31] Incidence of the OMT is broadly similar to that of the corporation income tax. Ontario iron mines are operated either by Ontario steel corporations or companies affiliated with United States steel manufacturers. Competitive conditions existing in the steel industry, the report concludes, prevent the shifting of the OMT tax burden in the short run.[32]

B. C. Lee, Comptroller and Mine Assessor, Ontario Department of Mines, and responsible for the administration of the OMT in 1964 and 1965, was of the opinion that the OMT "is levied on the mine much the same

"Taxes are either direct or indirect. A direct tax is one which is demanded from the very persons who it is intended or desired should pay it. Indirect taxes are those which are demanded from one person in the expectation and intention that he shall indemnify himself at the expense of another; such are the excise or customs.

"The producer or importer of a commodity is called upon to pay a tax on it, not with the intention to levy a peculiar contribution upon him, but to tax through him the consumers of the commodity, from whom it is supposed that he will recover the amount by means of an advance in price."

**29.** *Id.* at 292.

**30.** The Ontario Committee on Taxation, (1967), c. 32, ¶ 37.

**31.** Smith report, c. 32, ¶¶ 6, 38, and 39.

**32.** The Smith report states in ¶ 47:

"The major amount of Ontario's iron ore production is thus used for steel-making by the mine operator, the United States parent or some other affiliate of the mine operator, and so the burden of the mining profits tax falls at least initially upon the steel manufacturer either directly as the mine operator or indirectly as the shareholder of the mine operator. Because of the competitive conditions existing in the steel industry there can be no shifting in the short run, and since the proportion of the total requirements of U.S. mills filled from Ontario ore is so small it is doubtful that the tax would have any significant effect upon the price of steel in the United States, even in the long run."

as a property tax is levied on the assessed value of a building and its land." He concluded that the OMT was not in fact an income tax "although a certain artificial profit is arrived at to determine the tax base." [33]

■ D. *Application of the test to OMT.* As we have held in Part II, C, *supra*, the OMT was not actually intended to parallel a United States income tax. The question then is: did it nevertheless have the effect of falling on some net gain? In calculating it, significant costs were not taken into account, but taxpayer contends that these omissions fail to show that net gain was very unlikely to be reached.

Plaintiff first claims the OMT is a creditable foreign income tax because it is restricted to income from a particular source—mining—and a full array of deductions for expenses incident to the general conduct of that specialized activity assures that the tax falls only on net income. In plaintiff's view, deductions for interest, depletion and royalty payments to private parties would not be appropriate and are not allowed in the OMT because they are not expenses incurred in earning the particular class of income intended to be taxed. Such financial items, plaintiff claims, relate to a division of income among participants in the mining venture; they are not expenses of the particular mining activity. Deductions for preproduction exploration and development expenses were not allowed because they were taken into account in the original low tax rate, were not normally significant, and were not thought to be proper deductions in computation of net income.

Plaintiff compares the OMT to the "schedular" taxes utilized in some foreign countries. In such taxes, income from different sources or activities is segregated into different "schedules" and taxed under separate rules and rate tables. Plaintiff also points to the United States withholding taxes in I.R.C. §§ 871 and 881 as a direct parallel with the OMT. Withholding taxes, according to plaintiff, are creditable and are comparable to the OMT in that a particular type of income is taxed after deduction of operating expenses but without restriction for the financial items—interest, royalties, depletion—that represent a distribution of operating income.

In *Bank of America*, this court discussed domestic withholding taxes in I.R.C. §§ 871 and 881 in its consideration of taxes analogous to taxes on gross income.[34] The analogy was there rejected on the ground that it seemed clear that costs and expenses affecting production of the income being taxed in this country would not wipe out net gain. Nonresident alien taxpayers not engaging in business would not be likely to have expenses that would wipe out gains; foreign corporations with income from investment sources in this country are taxed in I.R.C. § 881(a) on gross income "only to the extent the amount so received is not effectively connected with the conduct of a trade or business within the United States"; and a foreign corporation connected with United States business, which in some years might experience losses, is taxed in I.R.C. § 882 only after charitable deductions and deductions related to the United States activities. Plaintiff's withholding tax analogy is not persuasive—the OMT is quite different from those taxes.

The class of income taxed by the OMT is likewise not comparable to the schedular type of classification or to the income reached by the withholding taxes. The OMT is a tax imposed on an active business operation that is measured by a particularized and artificial computation of net profit. The key to creditability is not that a particular class of net profit, reached by an accounting procedure that may be acceptable or justified for other considerations, is taxed; to be creditable, the net profit subject to foreign tax must be analogous to the

---

**33.** Speech of B. C. Lee, "Provincial Taxation," Canadian Tax Foundation Eighteenth Annual Tax Conference 89, Nov. 23–25, 1964.

**34.** *Bank of America Nat'l Trust & Sav. Ass'n v. United States, supra*, 198 Ct.Cl. at 280–81, 459 F.2d at 523.

type of net profit reached by the United States income tax. In view of the large-scale omission from the OMT of significant costs of the mining business, it cannot be said that the net gain of that business is sure, or very likely, to be reached by the tax. For instance, the nondeductibility of land expenses, rent, and private royalties— all or a large part of each of which mirror important costs of mining production—remove from the consideration of the OMT crucial expenses that are normally incurred in the mining business, significant expenses which may well offset any gain the company could make from mining. The same is true of other exploration, development, and pre-production costs.

Plaintiff's comments on the court's analysis of *Santa Eulalia* [35] is similarly defective. Plaintiff asserts the OMT reaches the same net profit as the gross income tax on mining royalties held creditable in *Santa Eulalia* because the royalty was itself a distribution of net profit, determined after all operating expenses had been deducted. In *Santa Eulalia*, however, the taxpayer was the royalty collector, who was not involved with mine operations; it was the taxpayer's expenses in obtaining the royalties that the court noted were unlikely to balance his gain so as to suffer a deficit on the royalty transaction. Caland is not in such a position. Caland is a taxpayer that is the active mine operator; whether it in fact has a net profit is dependent on the relationship of its expenses, operating and general, to its income from that business operation.

In the same connection, plaintiff strongly urges that the expenses disallowed as deductions in the OMT—*e.g.*, interest, royalties, depletion—are not pertinent to the particular class of income that is subject to the OMT. They do not need to be deductible, it is claimed, because they do not affect the profits of the mine as a separate business activity. Plaintiff would define profit of a mining activity as the excess of the sales revenue over operating costs required to produce the salable mineral product. The profit thus defined would be shared by the three classes of participants in the mining enterprise—creditors, mineral owners and equity owners. Plaintiff would separate the accounting for interest to creditors, and royalties and depletion to the mineral owners, from the profit of the mine as a particular class of activity. Deductions for these items would not be included in mining expenses, it is argued, because they affect only the manner that profit is distributed among the several investors in the mine. Taxpayer also emphasizes periods in the history of the United States income tax when deductions were not permitted for interest, depletion, royalty payments, and other expenses. Plaintiff contends, correctly, that "net income" has not been a fixed concept during the development of the United States income tax system. Accounting treatment of concepts as elusive as depletion, mineral royalties, and interest on capital investments, may vary with the objectives of the analysis.

The answer, in our view, is that, even if these observations might be true for some of the individual items, taken singly, that Ontario holds to be nondeductible, when the mass of the omitted items in the OMT are considered together and in combination as applied to plaintiff's mining business, it is clear to us that that tax does not seek to reach, or necessarily reach, any concept of net gain from the mining business which would be recognized as such in this country. It is as if a very large chunk of the outlays of that business had been shaved off, and only a fraction left, out of which "net gain" is to be found. The exclusions are far too widespread and important to permit the conclusion that some net gain is sure to be reached.

It may be (as we are told by one witness) that every company paying the tax had some true net gain, but that fact does not necessarily prove that companies not required to pay the OMT tax failed to have a

---

35. *Bank of America Nat'l Trust & Sav. Ass'n v. United States, supra*, 198 Ct.Cl. at 276, 459 F.2d at 520, commenting on *Santa Eulalia Mining Co. v. Commissioner*, 2 T.C. 241 (1943), *appeal dismissed*, 142 F.2d 450 (9th Cir. 1944).

net gain. Conversely, there was expert testimony that a taxpayer could show a loss under the Canadian federal and provincial income tax laws while, at the same time, be subject to tax under the OMT. We can see, in short, no real connection between "net profit" under the OMT and the general concept of net gain known to the United States (and to the regular Canadian income tax laws).

This disharmony is quite understandable. Where, as in the OMT, such essentials as land and rental expenses are omitted,[36] it is hard to believe that some net gain from mining is always made, or very likely so; it is as if wages (which can be considered in one aspect as an allocation of "profits") and production costs were wholly nondeductible and disregarded in calculating net gain. Nor is it appropriate, in the United States tax sense, to consider all such expenses as merely an allocation of profits. They are part of the expenses of the mining business, not too different from labor and production costs.

Moreover, plaintiff's attempt to separate mine operating costs from financing expense draws too fine a line. A separate corporation whose sole business was the operation of a single mine could not compute a net profit if it did not include all of its expenses relevant to its business. As a unit in a diversified and complex corporate structure, direct costs for Caland's particular mining activity can be separated conveniently from financing expenses relevant to that activity. Unlike the situation in a single business activity, the mining expenses plaintiff labels "financing" or "profit-sharing," rather than being general operating expenses of Caland's business, can be shifted to some other phase of plaintiff's corporate operations. Plaintiff's corporate interrelationships permit accounting flexibility but they are not determinative of whether Caland's operations in Canada produced profit for purposes of an I.R.C. § 901 credit. Allocation of amounts for corporate general overhead and expenses is the bane of all corporate managers because of the effect the allocations have on performance of the profit centers for which they are responsible.

Finally, there is the problem of the taxation of unsold inventory. Plaintiff concedes that § 3–(3)(b) of the OMT allows the mine assessor to tax unsold gold and gypsum held in inventory, but would have the creditability issue determined by the administrative practice applicable to iron ore and all other minerals. The mine assessor, except for gold and gypsum, imposed the tax only on OMT profits that resulted from actual sales. Plaintiff labels the gold and gypsum treatment a de minimis variation of the mine assessor's consistent practice, which, in the normal case computed a profit number from the value of ore that had actually been sold.[37]

Resort to the administrative practice of the mine assessor is not necessary or controlling. The OMT in § 3–(3)(b) expressly provides a method for the mine assessor to value processed minerals that are "not sold" at the actual market value of the output at the pit's mouth. Under this authority, for ores which "had an actual market value" the mine assessor was empowered to impose a tax on OMT profits from any type of production that had been placed in inventory and was not sold. This authority, in fact, was used for gold and gypsum, minerals that account for 10 percent of Ontario's total production in the review years. The OMT in its structure and express provisions thus permits the tax to be imposed on unre-

---

**36.** Including land and rent expenses not centered on the ore itself.

**37.** Plaintiff points to the court's remarks in *Bank of America* (*supra*, 198 Ct.Cl. at 273, 459 F.2d at 519) that reference should be made to the "actual system historically utilized by Congress in imposing domestic income taxes" to support its contention that administrative practice should control rather than theoretical construction. Plaintiff's reference is not apposite because the court did not refer to an administrative interpretation of statutory authority. The court gave preference to actual Congressional enactments over theoretical and potential tax schemes that were constitutionally permissible but which Congress had declined to use.

alized income, a generally impermissible result for an income tax in the United States sense.

The sum of it is that, from several viewpoints and in several aspects, taxpayer has failed to show that the OMT fits our concept of an income tax, or the concept spelled out in *Bank of America, supra.* The foreign tax credit under I.R.C. § 901 is therefore not allowable. This failure to permit a credit for payments made by Caland under the OMT will not result in double taxation because the OMT profit is not "net gain" of the type sought by the United States income tax. Rather, taxes paid to the Province of Ontario under the OMT seem to be taxes on the privilege to conduct mining operations in Ontario.

## CONCLUSION OF LAW

Upon the findings and the foregoing opinion, the plaintiff is entitled to deductions in 1964 and 1965 for all amounts of Contingent Liability accrued in those years under its Supplemental Unemployment Benefit plan, and judgment is entered to that effect. Plaintiff is not entitled to foreign tax credits in those years for payments under the Ontario Mining Tax Act. Plaintiff's claim on the Ontario Mining Tax Act issue is dismissed and the remainder of the case is remanded to the Trial Division for further proceedings under Rule 131(c) to determine the amount of refund due.