**TEXASGULF, INC., AND SUBSIDIARIES, as successor in interest to Texasgulf, Inc. and Subsidiaries, Petitioner–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

**Docket No. 97–4202.**

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1998.

Decided April 5, 1999.

Richard J. Urowsky, Sullivan & Cromwell, New York City (Willard B. Taylor, Michael Lacovara, C. Barr Flinn, Christopher S. Kippes), for petitioner-appellee.

Jonathan S. Cohen, United States Department of Justice, Tax Division, Washington, DC (Loretta C. Argrett, Assistant Attorney General, Ernest J. Brown), for respondent-appellant.

Before: KEARSE and STRAUB, Circuit Judges, and MURTHA, District Judge.[*]

STRAUB, Circuit Judge.

The Commissioner of Internal Revenue appeals from a decision of the United States Tax Court (John O. Colvin, *Judge* ) granting the petition of Texasgulf, Inc., and Subsidiaries ("Texasgulf") for a redetermination of tax liabilities for 1978, 1979, and 1980. The Tax Court concluded that for those taxable years, the Ontario Mining Tax ("OMT") is an income tax that qualifies for the foreign tax credit provided by Internal Revenue Code § 901 and Treasury Regulation § 1.901–2. The Commissioner disputes this conclusion, arguing that the OMT as enacted and interpreted during the taxable years at issue does not meet the net income requirement for foreign tax creditability. This is so, the Commissioner asserts, because the OMT neither allows recovery of nor effectively compensates for significant expenses attributable to the gross receipts included in its base. For the reasons that follow, we disagree with the Commissioner and therefore affirm.

## BACKGROUND

Texasgulf is the successor in interest to Texasgulf, Inc., a Texas corporation that filed consolidated federal income tax returns for the taxable years 1978 through 1981 as the common parent of an affiliated group of corporations that included Texasgulf Canada Ltd. ("Texasgulf Canada"). For the years 1968 through 1981, Texasgulf Canada and its predecessor owned and operated the Kidd Creek Mine, a cop-

[*] The Honorable J. Garvan Murtha, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

per, zinc, lead, and silver deposit near Timmins, Ontario. Texasgulf Canada's mining and processing activities at the Kidd Creek Mine made it subject to the OMT. For the years 1978, 1979, and 1980, Texasgulf Canada paid OMT in an aggregate amount of nearly $32 million (U.S.). On its consolidated U.S. income tax returns for those years, Texasgulf claimed foreign tax credits for these OMT payments pursuant to § 901, which, with certain limitations, permits citizens and domestic corporations to claim a foreign tax credit for "any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States." I.R.C. § 901(b)(1).[1] Upon the promulgation of § 1.901–2 in 1983, Texasgulf timely elected to apply its provisions retroactively to determine eligibility for credit under § 901 with respect to taxes imposed by Canada and its political subdivisions for the taxable year ended December 31, 1967 and all subsequent taxable years. *See* Treas.Reg. § 1.901–2(h) (permitting such an election for taxable years beginning on or before November 14, 1983).

On March 29, 1989, the Commissioner sent Texasgulf a statutory notice of deficiency concerning the taxable years 1978 through 1981. The Commissioner asserted, *inter alia*, that Texasgulf was not entitled to claim a foreign tax credit for its OMT payments because the OMT is not an income tax. On June 29, 1989, Texasgulf filed a petition for redetermination in the Tax Court. The parties subsequently agreed that they would litigate only whether Texasgulf is entitled to a foreign tax credit for OMT payments made by Texas-

gulf Canada during the taxable years 1978, 1979, and 1980.[2]

Essential to the resolution of this appeal is an understanding of the nature and operation of the OMT during the relevant taxable years. The versions of the OMT at issue impose a graduated tax on every mine in the Province of Ontario to the extent that the mine's "profit," as defined for OMT purposes, exceeds a statutory exemption.[3] *See* Mining Tax Act ("MTA"), R.S.O. ch. 140, § 3(1) (1972), amended by ch. 132, 1974 S.O. 1261, § 2, further amended by ch. 40, 1979 S.O. 225, § 1(1) (Can.); MTA, R.S.O. ch. 269, § 3(1) (1980) (Can.). The tax is generally imposed upon the mine "operator," defined as the party with the right to produce and sell the mine's minerals. *See* MTA, R.S.O. ch. 140, § 1(g), § 2(2) (1972) (Can.); MTA, R.S.O. ch. 269, § 1(h), § 2(2) (1980) (Can.). During the taxable years at issue, the statutory exemption was first $100,000 (Canadian) and then $250,000 (Canadian). *See* MTA, R.S.O. ch. 140, § 3(1) (1972), amended by ch. 132, 1974 S.O. 1261, § 2(1), further amended by ch. 40, 1979 S.O. 225, § 1(1) (Can.); MTA, R.S.O. ch. 269, § 3(1) (1980) (Can.). The versions of the OMT in effect between 1978 and 1980 define "profit" as:

the difference between,

(*a*) where the mineral substances raised, taken or gained from the mine are sold as such, the amount of the gross receipts from the output during the taxation year;

(*b*) where the mineral substances or a part thereof are not sold as such, the amount of the actual market value at

---

1. Inasmuch as Texasgulf could not utilize the full credit for 1978, the unused credit for that year was carried over to 1979, pursuant to I.R.C. § 904(c).

2. As of the time the briefs were filed in this case, Texasgulf was litigating its entitlement to foreign tax credit for OMT payments for the years 1968, 1969, and 1970 in the Court of Federal Claims, *see Texasgulf, Inc. v. United States,* 17 Cl.Ct. 275 (Cl.Ct.1989), *modified per unpublished order,* (Cl.Ct. Apr. 16, 1992), and

Texasgulf's liability for the years 1971 through 1977 was pending administratively before the Internal Revenue Service.

3. During the taxable years at issue, the OMT was administered by the Ontario Ministry of Natural Resources and was separate and apart from a Canadian federal income tax administered by the Canadian Department of National Revenue and an Ontario provincial income tax administered by the Ontario Ministry of Revenue.

the pit's mouth of the mineral substances raised, taken or gained from the mine that are fed into a treatment plant at any mill, smelter or refinery and the product thereof is sold in the taxation year; or

(c) if there is no means of ascertaining the actual market value at the pit's mouth of the mineral substances referred to in clause b, the amount at which the mine assessor appraises the value of such mineral substances, provided that the mine assessor in appraising such value shall deduct,

(i) the processing costs incurred as prescribed or determined by the regulations, and

(ii) an allowance for profit in respect of processing at a rate or rates prescribed by the regulations or determined by the mine assessor,

from the proceeds of the processed mineral substances sold during the taxation year,

and [certain specified] expenses, payments, allowances and deductions....

MTA, R.S.O. ch. 140, § 3(3) (1972), amended by ch. 132, 1974 S.O. 1261, §§ 2(3)–(4) (Can.); *accord* MTA, R.S.O. ch. 269, § 3(7) (1980) (Can.). In defining the "expenses, payments, allowances and deductions" that may be recovered, the OMT as enacted in 1978, 1979, and 1980 includes mine-related salaries, operating expenses, a depreciation allowance, certain development costs, and expenditures for scientific research conducted in Canada and related to mining in Ontario, but specifically excludes investment interest, cost depletion,[4] and royalties paid for production of a mine on privately owned land ("non-Crown royalties"). *See* MTA, R.S.O. ch. 140 §§ 3(3)–(4) (1972), amended by ch. 132, 1974 S.O. 1261, §§ 2(5)–(8), further amended by ch. 82, 1978 S.O. 609, § 2 (Can.); MTA, R.S.O. ch. 269, § 3(7), § 3(11) (1980) (Can.).

Although the versions of the OMT at issue establish three modes of calculating the appropriate tax, most OMT taxpayers, including Texasgulf Canada, used the third method, described in section (c) of the portion of the OMT quoted above. According to regulations in effect during the relevant period, the "allowance for profit in respect of processing" for purposes of this method is computed on the basis of a sliding scale, varying based on which processing assets the taxpayer owns and operates and where they are situated. *See* Mining Tax Regulations, O.Reg. 126/75, § 5(1) (1975), amended by O.Reg. 545/79, § 1 (1979) (Can.). Specifically, the processing allowance is:

- 8% of the capital cost of the processing assets for miners who own and operate a concentrator in Canada, but no smelter or refinery;

- 16% of the capital cost of the processing assets for miners who own and operate a concentrator and a smelter in Canada, but no refinery;

- 20% of the capital cost of the processing assets for miners who own and operate a processor, a smelter, and a refinery in Canada;

- 30% (or 25% after April 10, 1979) of the capital cost of the processing assets for miners who own and operate a processor, a smelter, and a refinery located in Northern Ontario; or

- 35% (or 30% after April 10, 1979) of the capital cost of the processing assets for miners who own and operate a processor, a smelter, and a refinery located in Northern Ontario and a semi-fabricating plant in Northern Ontario, where a significant proportion of the input to the plant originates from a mine in Ontario owned and operated by the person liable to pay the tax.

---

4. Specifically, the OMT provision at issue excludes "depreciation in the value of the mine, mining land or mining property by reason of exhaustion or partial exhaustion of the ore or mineral." MTA, R.S.O. ch. 140 § 3(4)(c) (1972), amended by ch. 82, 1978 S.O. 609, § 2 (Can.); MTA, R.S.O., ch. 269, § 3(11)(c) (1980) (Can.).

*See id.* The relevant OMT regulations also provide that the allowance may not be less than 15% nor more than 65% of the OMT taxpayer's combined profits. *See* O.Reg. 126/75, § 5(5) (Can.).

Before trial, the parties stipulated to certain data related to Texasgulf's OMT payments and industry-wide OMT payments for the taxable years 1968 through 1980.[5] The data include statistics for claimed processing allowances and for nonrecoverable expenses, defined as those expenses that are attributable to OMT gross receipts but cannot be recovered under the OMT. According to the stipulated figures, Texasgulf's processing allowance exceeded its total nonrecoverable expenses in ten of the thirteen years between 1968 and 1980, and Texasgulf's total processing allowance for the thirteen-year period exceeded its total nonrecoverable expenses by approximately $223 million (Canadian) or 91%.[6]

With respect to the industry-wide operation of the OMT, the stipulated data derive from a study conducted by Texasgulf's expert Robert B. Parsons, C.A., a partner in the Toronto office of the accounting firm Price Waterhouse and the author of a textbook on Canadian mining taxation.[7] Parsons examined 213 OMT returns, which collectively account for roughly 80% of the total OMT paid between 1968 and 1980. The Commissioner has conceded that Parsons' study includes a representative cross-section of OMT taxpayers. Of the 213 returns studied, 70 returns or 32.9% show nonrecoverable expenses in excess of the processing allowance claimed. Only 145 of the 213 returns show OMT liability. Of the 145, 23 returns or 15.9% show nonrecoverable expenses in excess of the processing allowance claimed. Over the period from 1968 to 1980, the aggregate processing allowance claimed on the 213 returns exceeds aggregate nonrecoverable expenses incurred by a ratio of 2.7 to 1. For the 145 returns showing OMT liability, the aggregate ratio for 1968–80 is even higher.[8]

The stipulated data also show the magnitudes of the various nonrecoverable expenses as compared to the mine operators' gross receipts. In the aggregate for all

5. The parties agreed to Texasgulf's OMT data as depicted in the chart on page 6 of the First Stipulation of Facts dated May 25, 1995. In the First Stipulation, the parties also agreed to the industry-wide OMT data depicted in Joint Exhibit 39–AM. In the Second Stipulation of Facts dated June 5, 1995, the parties agreed to the industry-wide OMT data depicted in Joint Exhibit 62–BJ. To the extent that the data from these two joint exhibits conflict, we rely on Joint Exhibit 62–BJ as it postdates Joint Exhibit 39–AM. Both exhibits are sealed.

6. In contrast to the parties' stipulation, the Tax Court's opinion suggests that Texasgulf's processing allowance exceeded its total nonrecoverable expenses for only six of the thirteen taxable years studied. However, for the reasons explained below, we need not definitively resolve the discrepancy.

7. Texasgulf's second expert witness was Kumara Rachamalla, Ontario's Mining Tax Assessor at the date of trial. The Commissioner objected to significant portions of Rachamalla's report and testimony pursuant to Rule 703 of the Federal Rules of Evidence because Canadian law precluded Rachamalla from revealing the data upon which he based his opinion or answering questions about the data on cross-examination. The Tax Court did not consider Rachamalla's report or testimony in reaching its decision. Without passing on the merits of the Commissioner's objection, we do the same and conclude, as explained below, that affirmance is appropriate regardless of Rachamalla's testimony.

8. All of these figures are based on the assumption that expenses for exploration outside Ontario are not attributable to the gross receipts included in the OMT base and therefore do not constitute nonrecoverable expenses for our purposes. The Commissioner's expert at trial suggested that some non-Ontario exploration costs should be deemed expenses attributable to OMT gross receipts. For the reasons discussed below, we do not decide whether this suggestion has any merit. We note that when all non-Ontario exploration expenses are included in the calculation of nonrecoverable expenses, 84 of the 213 returns (39.4%) show nonrecoverable expenses in excess of the processing allowance claimed, and 37 of the 145 returns showing liability (25.5%) show nonrecoverable expenses in excess of the processing allowance.

returns studied, interest, non-Crown royalty, and cost depletion expenses constitute 2.8%, 0.7%, and less than 0.1%, respectively, of gross receipts. All other nonrecoverable expenses incurred by the mine operators constitute in the aggregate approximately 1% of gross receipts.

The Tax Court held a two-day trial in June 1995, at which Texasgulf argued that the version of the OMT at issue meets the net income requirement for creditability under § 901 on two grounds: first, because the processing allowance effectively compensates for the nonrecoverable expenses, and second, because any nonrecoverable expenses are insignificant. In an opinion entered September 9, 1996, the Tax Court adopted Texasgulf's first argument, after concluding that Texasgulf had "shown that the processing allowance exceeded nonrecoverable expenses both in the aggregate and for the vast majority of OMT taxpayers" and that therefore "the OMT processing allowance was likely to approximate or exceed the nonrecoverable expenses for the years in issue." *Texasgulf Inc. & Subsidiaries v. Commissioner,* 107 T.C. 51, 67, 1996 WL 507512 (1996). The Tax Court did not reach the issue of the significance of the nonrecoverable expenses. *Id.* On March 27, 1997, judgment was entered in favor of Texasgulf. On June 18, 1997, the Commissioner filed a notice of appeal.

### DISCUSSION

The Commissioner contends that the Tax Court erred in holding that the version of the OMT at issue is an income tax creditable under § 901 because the tax neither allows recovery of nor effectively compensates for significant expenses—specifically, interest expense, non-Crown royalties, and cost depletion. We review the Tax Court's legal conclusions *de novo* and its factual findings for clear error, *see Estate of Gloeckner v. Commissioner,* 152 F.3d 208, 212 (2d Cir.1998), bearing in mind that Texasgulf has the burden of proving that the Commissioner's determinations are erroneous or arbitrary, *see Helvering v. Taylor,* 293 U.S. 507, 514–15, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Tax Ct.R.Prac. & P. 142(a).

Section 901 permits U.S. citizens and domestic corporations to elect, subject to certain limitations, to claim a tax credit against their U.S. income taxes for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States." I.R.C. § 901(b)(1). This foreign tax credit is designed to "mitigate the evil of double taxation." *Burnet v. Chicago Portrait Co.,* 285 U.S. 1, 7, 52 S.Ct. 275, 76 L.Ed. 587 (1932). Because § 901's exemption from taxation is "a privilege extended by legislative grace," it is strictly construed. *Inland Steel Co. v. United States,* 230 Ct.Cl. 314, 677 F.2d 72, 79 (1982) (per curiam).

Before the advent of § 1.901–2, "[t]he reaches of the word 'income' in section 901(b)(1) ha[d] been the subject of a long and tortuous history" "permeated" with "vagaries, confusion, and seeming contradictions." *Bank of Am. Nat'l Trust & Sav. Ass'n v. Commissioner,* 61 T.C. 752, 759, 1974 WL 2670 (1974), *aff'd,* 538 F.2d 334 (9th Cir.1976). In an effort to dispel the confusion, the Treasury Department promulgated § 1.901–2 in 1983 after issuing proposed and temporary regulations. *See* T.D. 7918, 1983–2 C.B. 113. The parties agree that § 1.901–2 applies to Texasgulf for the taxable years in issue.

Section 1.901–2 provides that as a general rule, "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax." Treas.Reg. § 1.901–2(a)(1). Under § 1.901–2, "[a] foreign levy is an income tax if and only if—(i) [i]t is a tax; and (ii)[t]he predominant character of that tax is that of an income tax in the U.S. sense." *Id.* As a general matter, the predominant character of a foreign tax is that of an income tax in the U.S. sense if "the foreign tax is likely to reach net gain in the normal circumstances in which it ap-

plies." Treas.Reg. § 1.901–2(a)(3)(i). Further, "[a] foreign tax is likely to reach net gain in the normal circumstances in which it applies if and only if the tax, judged on the basis of its predominant character, satisfies each of the realization, gross receipts, and net income requirements set forth [in § 1.901–2]." Treas.Reg. § 1.901–2(b)(1).

The Commissioner concedes that the versions of the OMT at issue are taxes rather than royalties and meet the realization and gross receipts requirements. The only dispute therefore is whether the OMT as enacted and interpreted during the relevant period satisfies the net income requirement.

Section 1.901–2 provides that:

A foreign tax satisfies the net income requirement if, judged on the basis of its predominant character, the base of the tax is computed by reducing gross receipts [as computed under § 1.901–2] to permit—

(A) Recovery of the significant costs and expenses (including significant capital expenditures) attributable, under reasonable principles, to such gross receipts; or

(B) Recovery of such significant costs and expenses computed under a method that is likely to produce an amount that approximates, or is greater than, recovery of such significant costs and expenses.

Treas.Reg. § 1.901–2(b)(4)(i). Additionally, "[a] foreign tax law that does not permit recovery of one or more significant costs or expenses, but that provides allowances that effectively compensate for nonrecovery of such significant costs or expenses, is considered to permit recovery of such costs or expenses." *Id.* Finally, "[a] foreign tax whose base, judged on the

basis of its predominant character, is computed by reducing gross receipts by items [described in (A) or (B) above] satisfies the net income requirement even if gross receipts are not reduced by some such items." *Id.*

■ As it did before the Tax Court, Texasgulf advances two theories for why the OMT meets the net income requirement: first, that the processing allowance effectively compensates for all nonrecoverable expenses, and second, that the nonrecoverable expenses are not significant. In support of its first theory, Texasgulf cites the empirical evidence presented to the Tax Court as to the relative magnitudes of processing allowances and nonrecoverable expenses as reported on OMT returns for Texasgulf and other OMT taxpayers. In weighing this evidence, we focus our attention on how the OMT operates with respect to the entire industry rather than just Texasgulf because under § 1.901–2, "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax." Treas.Reg. § 1.901–(2)(a)(1).[9] At the same time, we are reluctant to rely upon aggregate figures as opposed to return-by-return statistics in determining whether an allowance effectively compensates for nonrecoverable expenses, as aggregate figures may well be skewed by aberrant taxpayers or taxable years.

Without considering the aggregate data, we are able to resolve this appeal based on the return-by-return industry data to which the parties have stipulated. Only 32.9% of the returns studied show nonrecoverable expenses in excess of the processing allowance claimed. Moreover, among the returns that show an OMT liability, only 15.9% indicate nonrecoverable expenses that exceed the processing allowance claimed.[10] Given the large size

9. Accordingly, we need not resolve the apparent discrepancy between the Tax Court opinion and the parties' stipulation as to the relative magnitudes of Texasgulf's annual processing allowances and nonrecoverable expenses.

10. Even if we were to treat all non-Ontario exploration costs as expenses attributable to the gross receipts included in the OMT base, only 39.4% of all returns and only 25.5% of the returns showing OMT liability show nonrecoverable expenses in excess of the process-

and representative nature of the sample considered, these statistics suffice to show that the Tax Court did not clearly err in finding that the processing allowance was likely to exceed nonrecoverable expenses for the tax years at issue. Texasgulf has therefore met its burden of proving that the predominant character of the OMT as enacted and interpreted during the relevant taxable years is such that the processing allowance effectively compensates for any nonrecoverable costs.

■ The Commissioner raises two substantial objections to this conclusion. The Commissioner first argues that Texasgulf has not shown that the OMT satisfies the net income requirement because Texasgulf has not shown anything more than an accidental relationship between the processing allowance and the nonrecoverable expenses. At bottom, the Commissioner's argument is that the type of quantitative, empirical evidence presented in this case is not relevant to the creditability inquiry. However, the language of § 1.901–2—specifically, "effectively compensate" and "approximates, or is greater than"—suggests that quantitative empirical evidence may be just as appropriate as qualitative analytic evidence in determining whether a foreign tax meets the net income require-

ment. We therefore hold that empirical evidence of the type presented in this case may be used to establish that an allowance effectively compensates for nonrecoverable expenses within the meaning of § 1.901–2(b)(4).[11]

The Commissioner's second objection is that holding the versions of the OMT at issue in this case to be creditable would run afoul of two precedents: *Inland Steel Co. v. United States*, 230 Ct.Cl. 314, 677 F.2d 72 (1982) (per curiam), and Revenue Ruling 85–16, 1985–1 C.B. 180. In *Inland Steel*, the then-Court of Claims held that the OMT, as enacted in 1964 and 1965, was not eligible for the foreign tax credit under § 901. *See* 677 F.2d at 87. If for no other reason, *Inland Steel* can be distinguished because it was decided before the promulgation of § 1.901–2 in 1983. Although § 1.901–2's preamble reaffirms *Inland Steel's* general focus upon the extent to which a tax reaches net gain, both the preamble and § 1.901–2 introduce three detailed tests for conducting the net gain inquiry.[12] The last of the tests includes at least one principle that was not contemplated by *Inland Steel* or the cases cited therein—that is, the idea that "[a] foreign tax law that does not permit recovery of one or more significant costs or expenses, but that provides allowances that effective-

ing allowance claimed. Because these statistics would also suffice to establish that the Tax Court did not clearly err in finding that the processing allowance was likely to exceed nonrecoverable expenses, we see no need to decide whether any expenses for exploration outside Ontario should be considered nonrecoverable expenses attributable to OMT gross receipts.

11. We note, however, that this case is exceptional, in that the relatively small number of taxpayers subject to the OMT made it practicable to compile and present broadly representative industry data spanning a lengthy period. We do not suggest that the reliance that we place on empirical evidence would be appropriate in cases where such comprehensive data is unavailable.

12. The preamble states in pertinent part:
Under these final regulations, the predominant character of a foreign tax is that of an

income tax in the U.S. sense if the foreign tax is likely to reach net gain in the normal circumstances in which it applies. This standard, found in § 1.901–2(a)(3)(i), adopts the criterion for creditability set forth in *Inland Steel Company v. U.S.*, 230 Ct.Cl. 314, 677 F.2d 72 (1982), *Bank of America National Trust and Savings Association v. U.S.*, 198 Ct.Cl. 263, 459 F.2d 513 (1972), and *Bank of America National Trust and Savings Association v. Commissioner*, 61 T.C. 752, 1974 WL 2670 (1974). The regulations set forth three tests for determining if a foreign tax is likely to reach net gain: the realization test, the gross receipts test, and the net income test. All of these tests must be met in order for the predominant character of the foreign tax to be that of an income tax in the U.S. sense.

Creditability of Foreign Taxes, T.D. 7918, 48 Fed.Reg. 46,272, 46,273 (1983).

ly compensate for non-recovery of such significant costs or expenses, is considered to permit recovery of such costs or expenses." Treas.Reg. § 1.901–2(b)(4)(i). As explained above, this principle, in conjunction with § 1.901–2's clear mandate that a tax is or is not an income tax for all persons subject to it, leads us to a different result than that reached in *Inland Steel.*[13]

■ The Commissioner also cites Revenue Ruling 85–16, in which the Internal Revenue Service ruled that OMT payments are not royalties and therefore may not be excluded from the taxpayer's gross income from mining in computing percentage depletion under I.R.C. § 613. Rev. Rul. 85–16, 1985–1 C.B. 180. The Revenue Ruling is divided into four sections, captioned "Issue," "Facts," "Law and Analysis," and "Holding." Under "Law and Analysis," the IRS states that the OMT "is neither an income tax within the meaning of section 901(b) of the Code nor a tax in lieu of an income tax within the meaning of section 903." *Id.* at 180. While Revenue Rulings are entitled to great deference, *see Gillespie v. United States,* 23 F.3d 36, 39 (2d Cir.1994); *but see* Linda Galler, *Judicial Deference to Revenue Rulings: Reconciling Divergent Standards,* 56 Ohio St. L.J. 1037, 1040 (1995) (advocating nondeferential approach by courts to Revenue Rulings), we are not swayed in this instance because the comment on the OMT's creditability is not part of the Revenue Ruling's holding and because we read § 1.901–2 to dictate a contrary conclusion.[14]

13. Because the Court of Claims reached its decision before the promulgation of § 1.901–2, we need not decide whether changes in the OMT between the 1960s and the taxable years at issue here provide an alternate ground for distinguishing *Inland Steel.*

14. The Commissioner also argues that the processing allowance cannot effectively compensate for nonrecoverable expenses because it is unavailable to two classes of mine operators: those who do not process their ore and those who sustain no profit. We reject this argument because the Commissioner has con-

Having dismissed the Commissioner's objections, we conclude that the OMT as enacted and interpreted in 1978, 1979, and 1980 provides an allowance that effectively compensates for the nonrecoverable expenses and therefore meets the net income requirement for creditability under § 901. Because the processing allowance effectively compensates for nonrecoverable expenses, we do not reach Texasgulf's alternate argument that the version of the OMT at issue meets the net income requirement on the ground that the nonrecoverable expenses are not significant.

## CONCLUSION

For the foregoing reasons, the decision of the Tax Court is affirmed.

ceded that the sample of OMT returns considered above is representative and for the reasons discussed, the data drawn from that sample show that the predominant character of the OMT as enacted and interpreted during the relevant period is such that the processing allowance effectively compensates for any nonrecoverable costs. We also note the Tax Court's finding that mining companies that do not process mined material "are very insignificant in numbers and dollars in Ontario." *Texasgulf Inc. & Subsidiaries v. Commissioner,* 107 T.C. 51, 57 n. 1, 1996 WL 507512 (1996).