Justice SOTOMAYOR, concurring.
The Court's conclusion that the windfall tax is a creditable excess profits tax under 26 U.S.C. § 901(b)(1) depends on two interrelated analytic moves: first, restricting the "predominant character" analysis to those companies that shared an "initial period" of rate regulation of 1,461 days; and second, treating the tax's initial period variable as fixed. See ante, at 1903 - 1905. But there is a different way of looking at this case. If the predominant character inquiry is expanded to include the five companies that had different initial periods, especially those with much shorter initial periods, it becomes impossible to rewrite the windfall tax as an excess profits tax. Instead, it becomes clear that the windfall tax is functionally a tax on value. But because the Government took the position at oral argument that the predominant character inquiry should disregard such "outlie[r]" companies, see Tr. of Oral Arg. 38-39, and this argument is therefore only pressed by amici, Brief for Anne Alstott et al. as Amici Curiae 28-30 (hereinafter Alstott Brief), I reserve consideration of this argument for another day and another context and join the Court's opinion.
* * *
The Internal Revenue Code provides that "income, war profits, and excess profits taxes" paid to a foreign country *345 are creditable. 26 U.S.C. § 901(b)(1). Whether a foreign tax falls within one of these categories depends on whether its "predominant character ... is that of an income tax in the U.S. sense." 26 C.F.R. § 1.901-2(a)(1)(ii) (2010). As the Court explains, there are three components to this inquiry, ante, at 1901 - 1903, but at its core the inquiry simply asks whether a foreign tax resembles a typical income, war profits, or excess profits tax, ante, at 1902.
Importantly, though, the relevant Treasury Regulations also provide that a foreign tax "is or is not an income tax, in its entirety, for all persons subject to the tax." 26 C.F.R. § 1.901-2(a)(1). One way to *1908 understand this language is that for a tax to be classed as a creditable income tax, its predominant character must be that of an income tax with respect to "all persons subject to the tax." Of course, among the many persons subject to a tax, some may face tax burdens different from the majority of affected taxpayers. The challenge in applying predominant character analysis will sometimes lie in determining whether and how such outlier taxpayers affect the characterization of a given tax.[1] *346 The windfall tax at issue here exemplifies this problem. As the Court notes, ante, at 1907 - 1908, the parties stipulated to the following form of the windfall tax:
P Tax = 23% × [(365 × (-) × 9) - FV] D
If the predominant character analysis is restricted to those 27 companies that share an identical initial period length, then it makes sense to fix D at 1,461, as the Court does. Ante, at 1903 - 1905. And from there, it is just a matter of basic algebra, ante, at 1903 - 1904, and n. 4, to show that these companies' tax liability is equal to total profits minus a threshold amount (in this case, 44.47% of each company's flotation value) multiplied by a percentage-form tax rate: Tax = 51.71% x [P − (44.47% x FV ) ]. See ante, at 1903 - 1904; Brief for Petitioners 10. Because an excess profits tax is generally a tax levied on the profits of a business beyond a particular threshold, see Wells, Legislative History of Excess Profits Taxation in the United States in World Wars I and II, 4 Nat. Tax J. 237, 243 (1951), it appears to follow that the windfall tax can properly be characterized as an excess profits tax.
But not all of the 32 affected companies had an initial period length of 1,461 days; 5 of the companies had different initial periods. See App. 34, 39-41. When these different initial period values are inserted into the formulation proposed by PPL, two results follow. First, these companies *347 have tax rates different from the 51.71% *1909 rate the Court calculates for the 27 other companies. Second, their excess profits threshold also varies.
For example, consider Railtrack Group, a clear outlier with an initial period of 316 days. Inserting this value into the stipulated formula yields the following:
P Tax = 23% × [(365 × (-) × 9) - FV] D
Applying the Court's algebra, this formula can be reduced to the following: Railtrack Group's Tax = 239.10% x [P − (9.62% x FV ) ]. Railtrack Group's "effective" tax rate and its excess profits threshold (239.10% and 9.62% respectively) are very different from those companies with the common initial period length of 1,461 days (51.71% and 44.47%). See ante, at 1904 - 1905. Railtrack Group is not alone in this respect: four other companies also had tax rates and excess profits thresholds that differed from the majority of affected companies. See App. 34, 38-40.[2]
Once these outlier companies are included in the creditability analysis, it becomes clear that the windfall tax "is not an income tax ... for all persons" subject to it. 26 C.F.R. § 1.901-2(a)(1) (emphasis added). A typical income tax applies a fixed percentage rate to a base income that varies across taxpayers. An excess profits tax does the same, but incorporates a threshold, which may or may not vary across taxpayers, to exempt a portion of the base from taxation *348 . In contrast, here both of the rate and threshold components vary from company to company according to the D variable.[3]
Seen through this lens, the windfall tax is really a tax on average profits. See Alstott Brief 28-30. Under the parties' stipulated form of the windfall tax, each company pays a fixed tax rate of 23% on a base that is calculated by first multiplying a company's daily average profits during its initial period (i.e., (P/D ), or total profits over the initial period divided by the length of the initial period) by a fixed price-to-earnings ratio; and then subtracting that company's flotation value (FV ). See ante, at 1907 - 1908. In practice, this means that, for example, a company that earns $100 million over 1,461 days would pay approximately the same amount of taxes as a company that has earned $25 million over 365 days. These two companies would have almost the same average *1910 profits. See Alstott Brief 28. This is not how an income tax works.
The difference between a tax on profits and tax on average profits is especially significant for properly characterizing a tax such as the windfall tax. Average daily profits multiplied by a price-to-earnings ratio, rather than being a way of approximating income, is a way of approximating value.[4]
*349 See Thompson, A Lawyer's Guide to Modern Valuation Techniques in Mergers and Acquisitions, 21 J. Corp. L. 457, 532-533 (1996) (describing similar valuation techniques using price-to-earnings ratios). Accordingly, incorporating an outlier like Railtrack Group into the predominant character analysis suggests that the windfall tax is a tax on a company's value. Railtrack Group and the companies like it are not random outliers, Brief for Petitioners 38, n. 3, but instead are critical pieces of data for understanding how the tax actually functioned as a matter of "economic realit [y]." Commissioner v. Southwest Exploration Co., 350 U.S. 308, 315, 76 S.Ct. 395, 100 L.Ed. 347 (1956).
This argument, however, rests on the premise that because the relevant regulations state that "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax," 26 C.F.R. § 1.901-2(a)(1)(ii), a tax's predominant character must be as an income tax for all taxpayers. But if a tax only needs to be an income tax for "a substantial number of taxpayers" and does not have to "satisfy the predominant character test in its application to all taxpayers," Exxon Corp. v. Commissioner, 113 T.C. 338, 352 (1999), then this average profits argument cannot get off the ground. Under this reading, the regulations tell courts to treat outliers like Railtrack Group as flukes.
At oral argument, the Government apparently rejected the notion that "outliers" like Railtrack Group are relevant to creditability analysis. See Tr. of Oral Arg. 35-39. The Government also did not argue these outliers' relevance before the Court of Appeals, ante, at 1907, n. 6, and so this argument, and the regulatory interpretation it depends upon, has only been presented to this Court by amici, see Alstott Brief 17-18, 28-30. We are not barred from considering statutory and regulatory interpretations raised in an amicus brief, but we should be "reluctant to do so," Davis v. United States, 512 U.S. 452, 457, n. *, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), when the issue is one of first *350 impression and the Federal Government has staked out what appears to be a contrary position. Thus, while I find this argument persuasive, I do not base my analysis of this case on it and therefore concur in the Court's opinion.

For example, some taxes may produce outliers that might suggest that the tax is not an income tax, when in fact the tax is attempting to reach net gain and therefore has the predominant character of an income tax. This situation often arises when a tax relies on imperfect estimates and assumptions in attempting to calculate net gain. Such a tax strives to treat similarly situated taxpayers the same but fails to do so only because the estimated component inadvertently affects some taxpayers differently. A situation of this kind occurred in Texasgulf, Inc. v. Commissioner, 172 F.3d 209 (C.A.2 1999). In that case, a Canadian mining tax did not permit taxpayers to deduct their specific expenses, but did permit them to deduct a fixed "processing allowance." Id., at 211-213. The taxpayer argued that the tax was creditable because the processing allowance was an attempt to reach net income, gross income minus expenses, by using " 'a method that is likely to produce an amount that approximates, or is greater than, recovery of such significant costs and expenditures.' " Id., at 215 (quoting 26 C.F.R. § 1.901-2(b)(4)(i)(B) (1999) ). To support its argument, the taxpayer introduced empirical evidence that roughly 85% of companies facing mining tax liability had nonrecoverable expenses less than the processing allowance. Texasgulf, Inc., 172 F.3d, at 215-216. The Court of Appeals agreed with the taxpayer that the tax was a creditable income tax because it was clear that the mining tax was attempting to reach net income, albeit by using an estimate to calculate deductions. Id., at 216-217. This result is sensible: A company that happens to have deductible expenses greater than the fixed amount set by the processing allowance is not an instructive outlier regarding the mining taxes predominant character. The mining tax is attempting to reach that company's net income, but fails to do only because it relies on an approximate value for deductions.

The figures for the other four companies are as follows: Powergen plc, which had an initial period of 1,463 days had a tax rate of 51.64% and an excess profits threshold of 44.54%, App. 38-39; National Power plc, which had an initial period of 1,456 days, had a rate of 51.89% and a threshold of 44.32%, id ., at 39-40; Northern Ireland Electricity plc, which had an initial period of 1,380 days, had a rate of 54.75% and a threshold of 42.01%, id ., at 40; and British Energy plc, which had an initial period of 260 days, had a rate of 290.60% and a threshold of 7.91%, id ., at 34. British Energy, however, did not end up having any windfall tax liability. Id ., at 33.

At oral argument, PPL contended that an excess profits tax in which the excess profits threshold varies according to market capitalization would also have an effective tax rate that varies across taxpayers but remains creditable. Tr. of Oral Arg. 26-27. That might be true, but that does not describe the situation here. In PPL's hypothetical, any shift in the effective tax rate depends on the profits threshold; Here, under PPL's version of the windfall tax, both the effective tax rate and the profits threshold move proportionately to a company's initial period length.

Petitioners suggested at oral argument that because some of the outlier taxpayers may have been subject to a more favorable regulatory regime in the wake of their privatization, their outsized tax rates are less meaningful because they could recoup their windfall tax burdens. See id ., at 16-17. Even accepting the premise of this argument, it still does not change that fact that in "substance," ante, at 1903 - 1904, the tax functioned as value tax for these companies.